IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHRISTINE L. MORRISON, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| JOANNE B. BARNHART, | : | |
| COMMISSIONER SOCIAL SECURITY | : | NO.   05-0352 |
| ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

REPORT AND RECOMMENDATION

CHARLES B. SMITH
UNITED STATES MAGISTRATE JUDGE

Currently pending before the Court are cross-motions for summary judgment regarding plaintiff's application for Supplemental Security Income ("SSI") under Titles XVI of the Social Security Act, 42 U.S.C. § 401, et seq.  For the reasons which follow, the Court recommends that defendant's motion be denied and plaintiff's motion be granted to the extent that the matter be remanded for proceedings consistent with this Report and Recommendation.

I.   PROCEDURAL HISTORY

Plaintiff, Christine L. Morrison, filed an application for SSI on May 8, 2003, alleging disability since May 1, 2003, due to depression and physical impairments.  (R. 70, 80).  The state agency denied plaintiff's application initially on July 22, 2003.  (R. 60-65).  After plaintiff filed a timely Request for Hearing, Administrative Law Judge ("ALJ")William J. Reddy held a hearing on February 3, 2004.  (R. 14, 37-59).  ALJ Reddy issued a decision, dated March 26, 2004, finding plaintiff not disabled. (R. 19-27). Plaintiff requested review by the Appeals Council, which affirmed the ALJ's decision on November 24, 2004, making the ALJ's decision the final decision of the Commissioner.  (R.5-7).

Plaintiff then filed a complaint in this Court seeking judicial review of the Commissioner's

decision. She now argues that the ALJ failed to afford appropriate weight to the reports of plaintiff's attending psychiatrist, which if properly credited would result in a finding of disability.

II.   MEDICAL HISTORY

    A.   Vocational Profile

Plaintiff was born on December 23, 1961, making her forty-three years old at the time of the ALJ's decision. (R. 70). She dropped out of school after getting to the tenth grade and has no past relevant work experience. (R. 20, 134).

    B.   Medical Records

        1.   Pre-Onset Date Records

Although plaintiff's alleged disability-onset date was not until May 2003, the record includes treatment notes from as early as 2000. She reported to the Northeast Community Center for Mental Health/Mental Retardation on August 28, 2000. (R. 388). The intake officer noted that plaintiff was the single mother of two children and she lived with her daughter, mother and sister. She presented depressed with impaired memory and had been isolating and withdrawing from friends and family. Plaintiff reported two hospitalizations and a history of alcohol abuse with no rehab. She reported two past suicide attempts with no current suicidal ideation and her GAF score at the time of admission was assessed as 40. (R. 388). Plaintiff's diagnosis was listed as major depression recurrent with psychosis and alcohol abuse and in October she was evaluated for the Partial Hospitalization Program. (R. 389-390).

On November 13, 2000, plaintiff was admitted to Friends Hospital feeling depressed and suicidal. At the time of admission her GAF score was assessed as 20 and her score for the past year and upon discharge on November 17 was 50. (R. 273-275). Her diagnosis was schizoaffective disorder depressed and alcohol dependence. Plaintiff's condition upon discharge was stable, but her prognosis was poor. (R. 274). As part of the Northeast Community Center Partial Hospital program plaintiff saw a psychiatrist and therapist beginning on November 29, 2000, after she had been discharged from Friend's Hospital.

She admitted to alcohol abuse and had not been taking her prescribed dose of Effexor. (R. 276).

On December 1, 2000 plaintiff reported to Friends Hospital again with depression and thinking of killing herself. It was noted that she had not been particularly compliant with medication and had been trying to get Social Security disability. Her GAF score on admission was 30 and at the time of discharge on December 5 was 50. (R. 271-272). After being given medications for several days, plaintiff began to show signs of control, relief of depression and suicidal ideation. (R. 271). Her prognosis was guarded. (R. 272).

According to her Treatment Plan Review/Update from Northeast completed on December 27, 2000, which was signed by plaintiff, her therapist and the psychiatrist, plaintiff had made little or no progress towards her goals. Her depression persisted and she continued to binge on alcohol on weekends. Her GAF score was assessed as 40. (R. 378). At subsequent sessions with the psychiatrist, plaintiff reported problems with incontinence that she had not yet discussed with her primary care physician. (R. 278, 280). According to the Treatment Plan Review/Update completed on February 6, 2001, plaintiff had still made little or no progress towards her goals, continued to experience feelings of depression, and continued to self medicate and abuse alcohol. Her GAF score was assessed as 42. (R. 379).

In March and again in May, 2001, the psychiatrist noted again that plaintiff was not compliant with her medication. (R. 279, 281). According to her Treatment Plan Review/Update dated May 3, 2001, she had still made little or no progress and attendance and compliance with medication remained a problem. Her GAF score was again assessed at 40. (R. 380).

On July 2, plaintiff once again voluntarily admitted herself to Friends Hospital. She reported an increase in auditory hallucinations yelling at her and suicidal thoughts without a plan. (R. 269). Upon admission it was not that "she possibly had stopped taking her medication although this was never made clear." She also "had been drinking alcohol to excess with perhaps three 6 packs of beer nightly." (R. 269). Upon admission her GAF was 15 with a GAF score of 55 for the past year and at discharge on July

10, 2001. (R. 270).

At her next appointment with the psychiatrist at Northeast, in July, it was noted that she had stopped taking her medication and decompensated, which resulted in her hospitalization. (R. 282). On July 11, 2001, on her Treatment plan Review/Update her GAF score was once again listed as 40. She had still made little or no progress, had depression and difficulty managing anger, and continued to self medicate. (R. 381). In August and October she remained non-compliant with taking her medications as prescribed because of weight gain, which resulted in frequent decompensation. (R. 283, 284). On October 9, 2001, she had still made little or no progress and her GAF score was 40. (R. 382).

Plaintiff was once again admitted to Friends Hospital on November 22, 2001, this time upon a petition filed by her sister. Plaintiff's sister reported that she had stopped taking her medications which consisted of Zyprexa and Effexor, that she became increasingly agitated with paranoid thoughts and fought with her, and that she drank to intoxication. Plaintiff admitted to drinking to intoxication one or twice a week. (R. 267). Plaintiff also admitted that she had stopped her medications for several weeks prior to admission because she felt better. (R. 267). During her course in the hospital, she was restarted on medication and tolerated them well with no side effects. After restarting her medications, plaintiff "improved considerably such that her thought processes were concrete but goal directed." (R. 267). She was discharged on November 27, 2001 on Effexor and Zyprexa. Although her GAF score upon admission was 15, at the time of discharge and for the past year it was listed as 55. (R. 268).

At her next appointment with her psychiatrist at Northeast, in December, the psychiatrist noted that plaintiff's attendance in the partial program had been poor. Plaintiff reported drinking which resulted in her being hospitalized. She was described as having no insight and reported that in the future she would only drink rather than mixing drinking and pills. She was taking her medication sporadically. (R. 285). In January 2002, her psychiatrist noted that she had been non-compliant with program attendance and although she had not taken her medication for ten days, she presented less confused. (R. 286). According

4

to the Treatment Plan Review/Update dated January 15, 2002, plaintiff's GAF score was 40. She had still made little or no progress and continued to experience a high level of depression and difficulty managing anger. (R. 383).

On April 14, 2002, plaintiff was brought to Friends Hospital by a police officer after calling 911 because she was depressed and hearing voices. (R. 265). She had been on Effexor and Zyprexa and stopped taking them two weeks earlier. She also reported that she had been going to the Northeast MHC but stopped a couple of months ago. Plaintiff reported having a few drinks but otherwise denied substance abuse. Her GAF upon admission was 30 and 40 upon discharge. (R. 265-266).

Plaintiff's GAF Score was still 40 on May 15, 2002, and it was noted that she had made minimal progress toward treatment goals, but continued to experience depressive symptoms and auditory hallucinations. Her barriers to treatment were her poor attendance and resistance to taking medications as prescribed. (R. 384). According to her next update, dated August 19, 2002, plaintiff's GAF score was 39 and she had made little or no progress. She had not attended the program since May. Her family was very supportive, but she tended to isolate and had a history of treatment non-compliance. (R. 386).

On September 24, 2002, plaintiff was taken to the Emergency Room at Temple Hospital after drinking a half case of beer and taking four Xanax (although she reported to the therapist she drank 2-6 packs of beer and took four Xanax). (R. 109-152). She denied that she was trying to kill herself, explaining that she has a 15 year old daughter who is the most important thing to her. (R. 133). She wanted a new therapist because her old one had arranged for her to attend Northeast which she did not want. She explained that she did not want to sit around 8 hours a day listening to people whine. Plaintiff indicated that after going a few times she was discharged from the program for non-compliance. She denied any suicide attempts or suicidal ideations in her life. (R. 133).

Eight months later, on April 26, 2003, plaintiff was admitted to the Temple University Hospital Episcopal Campus for violent behavior, talking to herself and not caring for herself. (R. 157-177). She

reported that she was drunk at the time and did not remember what she had done. Her diagnosis upon admission was "mood disorder, not otherwise specified, rule out substance induced mood disorder, rule out bipolar disorder, alcohol abuse." Plaintiff's GAF score was 30. (R. 157). She showed little insight into her drinking and problems secondary to her drinking. Her prognosis was listed as "guarded because of her history of drinking." Upon discharge on May 1, 2003, plaintiff's alleged date of onset, her GAF score was 60. (R. 158).

    2.    <u>Post-Onset Date Records</u>:

In June 2003, state agency medical expert, Thomas E. Fink, Ph.D., completed a Mental Residual Functional Capacity Assessment of plaintiff. After considering Listings 12.04 and 12.09, Dr. Fink concluded that plaintiff's condition did not satisfy either listing. (R. 186-200). Dr. Fink concluded that plaintiff's ability to understand and remember detailed instructions, her ability to carry out detailed instructions, to maintain attention and concentration for extended periods, and her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods was moderately limited and plaintiff had no significant limitations in any of the other areas listed. (R. 182-183). As support for his findings, he noted plaintiff's non-compliance, that she was drunk at various admissions and that plaintiff was substantially improved by the time of discharge following removal of drug and alcohol use. He also noted that she was able to perform activities of daily living including house care, cleaning, shopping laundry, and taking public transportation. (R. 198-200, 185). He noted that she retained the ability to understand and follow simple instructions and to perform simple routine tasks. (R. 185).

On July 2, 2003, Hass Shafia, M.D. interviewed and performed a physical examination of plaintiff prior to making a disability determination. (R. 201-204). Although plaintiff indicated that she had a heart problem, urinary incontinence upon exertion and neck pain, Dr. Shafia concluded that her alleged physical impairments were non-severe. (R. 205). The state agency therefore denied plaintiff's claim for SSI in July

2003. (R. 60-65).

Plaintiff then reported to Temple University Hospital Behavioral Health Services Crisis Response Center, where she sought treatment from August 12 to August 15, 2003. (R. 223-264). She reported that she was depressed and could not stay in her house because they keep people locked in the basement next door. (R. 224). She had called the police but they did not find anything. Plaintiff reported that she would kill her neighbor if her daughter was not in the army, but her daughter would get her in trouble. The examiner noted that plaintiff obviously posed a threat to her neighbor. (R. 230). Her GAF was assessed at 30. (R. 235). Plaintiff was prescribed Effexor upon discharge and referred to COMHAR. (R. 253).

Plaintiff first reported to COMHAR where she saw Nadine E. Rogers, M.D., on September 5, 2003. She reported a history of bipolar disorder and alcohol dependence with borderline personality disorder. Plaintiff indicated that she had a relapse three weeks earlier with beer but since then had been sober. She explained that part of her knows that her paranoid idea that hostages were being held next door is not true. (R. 210). According to notes dated September 26, 2003, plaintiff did not fill her prescription written by Dr. Rogers on September 5. Although she had some left over, plaintiff admitted she did not take the medication regularly and had not had medications for a couple of weeks. (R. 211). The next note, dated December 12, 2003 indicates that plaintiff had not been coming to the program and had relapsed over Thanksgiving. She indicated that she was going to try to come everyday and to take recovery more seriously. Plaintiff admitted that she had not taken medication faithfully enough to know if they help. She had depressed feelings over the holidays but felt better that she came to the program. (R. 212).

A note from January 20, 2004 indicates that plaintiff came in to get medication. She had not been coming to program regularly and was possibly going to be transferred. She had run out of medication a couple of weeks earlier and reported that when she is not taking the medication she gets depressed and drinks more. She had last had alcohol one week ago. (R. 213). On that same date, Dr. Rogers completed a Medical Assessment of Ability to Do Work Related Activities (Mental) form indicating that plaintiff's

ability to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stress, function independently, maintain attention/concentration, understand, remember and carry out complex job instructions, understand, remember and carry out detailed but not complex job instructions, and to demonstrate reliability was "poor or none". She opined that plaintiff's ability to understand, remember and carry out simple job instructions, maintain personal appearance, behave in an emotionally stable manner, and relate predictably in social situations was "fair". (R. 220-222). She indicated that plaintiff hears voices, has paranoid thoughts, is tangential, has frequent relapses with alcohol and has blunt affect. Dr. Rogers also noted that plaintiff has poor concentration and frequently misses appointments. (R. 221-222). Finally, on January 22, 2004, Dr. Rogers completed a form indicating that if plaintiff's alcohol abuse stopped she would still be paranoid, delusional, have tangential thoughts and blunt affect and would not be able to sustain employment. (R. 206).

     C.    <u>Administrative Hearing Testimony</u>

On February 3, 2004, plaintiff and a Vocational Expert ('VE") testified before ALJ William Reddy regarding her disability. (R. 37-52). At the beginning of the hearing, it was established that plaintiff had two prior applications, one in 1994 and a second in August of 2000, which was denied March 30, 2001, both of which were unable to be reopened. (R. 40). She explained that she currently lives alone but there was a possibility that someone might move in with her. (R. 43-44).

Plaintiff testified that she began attending COMHAR in August and goes three days a week. She explained that she was originally supposed to go every day, but "hardly even went twice a week." (R. 44-45). According to plaintiff, the medications prescribed would help with manic symptoms and depression. (R. 455). The hours to go to COMHAR are from 9:00 to 3:00. When asked if she is still using alcohol, plaintiff testified that she does not want to go back to that. However, she admitted that she had last had beer that Thursday. (R. 46). In response to her attorney's question as to whether plaintiff still hears voices when taking her medication, plaintiff testified that she had moved in April and really had not steadily been

taking medication, but then stated that the voices are lower. (R. 46-47). Upon questioning by the ALJ, plaintiff testified that she did not take her medication the way she was supposed to but she was going to now. (R. 47). In order to get to COMHAR, plaintiff takes a bus and walks a few blocks. (R. 48).

As to her prior work history, plaintiff testified that she worked for a printing place at a law firm doing letterheads for about three months in 1989. She was unable to remember what type of work she did for MPK Trust in 1990 and 1991. (R. 48-49). Plaintiff testified that the last time she took medication was a daytime pill yesterday, but she did not take medication last night. She explained that after drinking she is supposed to wait one week before taking medication. (R. 49). When asked about side effects from her medications, she testified that there was not anything bad. She explained that if she takes them steadily for a couple of weeks they "kick in", which is what she plans to do. (R. 49-50).

When asked if she has problems with concentration or focusing, plaintiff testified that she has not done anything to make her focus, but she does not think so. She then stated that she sometimes has trouble getting things done. She does not clean her house for a month, but then gets around to doing it. (R. 50). Plaintiff does not watch television and the only book she reads is a book about recovery called <u>As Bill Sees It.</u> (R. 50). She testified that she attends AA meetings and sometimes she will hear somebody screaming outside. She explained that going to COMHAR is like going to AA meetings because people talk about problems and say the serenity prayer, but they do not "get into the book". On days that she does not go to COMHAR she stays at home, sleeps a lot and barricades herself. She prepares frozen meals for herself, does food shopping, but not every week, and pays her bills with money orders that she buys wherever they are the cheapest. She had last seen her AA sponsor last Wednesday and was thinking of getting another one. (R. 52-53).

Upon questioning by her attorney, plaintiff testified that she moved into her own house in 2003 right around the time she applied for benefits. Prior to that she lived with her mom for about six years and nine months. (R. 53). Plaintiff has one daughter who is in her last year of high school. Since January or

February her mother has had custody of her daughter and her daughter stayed with her mother when she moved out. (R. 53-54). Prior to that plaintiff did not want her daughter to go to school because she thought the voices she heard were her daughter screaming. (R. 54). Plaintiff also had another daughter whom she put up for adoption, but she called plaintiff on the phone in 2000 or 2001. (R. 54). Plaintiff's sister, Patricia, came to the hearing with her and helps her when she has to get to an appointment, as well as financially. (R. 56).

Following the conclusion of plaintiff's testimony, the ALJ questioned vocational expert Gary Young, regarding plaintiff's ability to perform substantial gainful activity. (R. 57). First, the VE testified that a limitation for a hypothetical individual to just simple routine tasks would not have any kind of an effect on the unskilled occupational base. (R. 57). Finally, the VE testified that someone with the limitations assessed by Dr. Rogers on the assessment form dated January 20, 2004, (poor or none in all areas of making occupational adjustments and performance adjustments, fair for remembering and carrying out simple job instructions and poor or none for demonstrating reliability) would not be able to obtain or retain employment. (R. 58).

III.   THE ALJ'S DECISION

On March 26, 2004, the ALJ issued a decision finding plaintiff not disabled for purposes of benefits. (R. 19-27). Under step one of the sequential analysis, the ALJ determined that plaintiff had not engaged in substantial gainful activity since her alleged onset date. (R. 20). Pursuant to step two, he deemed plaintiff's bipolar disorder and alcohol abuse disorder as "severe" impairments within the meaning of the Social Security Act,[1] but found that her alleged physical impairments, including neck pain, were not severe. (R. 21). Considering the third step, the ALJ remarked that her impairments failed to meet or equal

---

[1] The Commissioner has promulgated a five-step sequential analysis, which is used to evaluate claims of disability, as follows: (1) whether the claimant is engaged in substantial gainful employment; (2) whether the claimant suffers from a "severe" impairments; (3) whether the impairment meets or equals the severity of a listed impairment; (4) whether the claimant can return to his past relevant work; and (5) whether the claimant has the residual functional capacity to engage in other work in the national economy. 20 C.F.R. § 404.920(b)-(g) (2003).

10

the criteria of either Listing 12.04 (Affective Disorders) or Listing 12.09 (Substance Addiction Disorders). (R. 21-23). Turning to an assessment of plaintiff's residual functional capacity, the ALJ found that plaintiff retained the residual functional capacity to perform the exertional demands of all levels of work, and that when compliant with medication and not abusing alcohol, she can perform simple routine tasks. (R. 25). At step four of the analysis, the ALJ noted that plaintiff had no past relevant work within the regulatory definition. (R. 25). Using section 204.00 of the Medical Vocational Guidelines, as a framework, and relying upon the VE's testimony that a limitation to simple routine work would not significantly reduce the unskilled occupational base at any exertional level, the ALJ deemed plaintiff not disabled. (R. 26).

IV.   STANDARD OF REVIEW

On judicial review of a final decision from the Commissioner of Social Security, a court must determine whether the Commissioner's ruling is supported by substantial evidence. 42 U.S.C. § 405(g); Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied, 507 U.S. 924, 113 S. Ct. 1294 (1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir.), reh'g denied (3d Cir. Sept. 9, 1988). "Substantial evidence" does not mean "a mere scintilla," but rather indicates such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971). Although a reviewing court has a duty to review the evidence in its totality, Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997) (quoting Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984)), the court is "bound by the ALJ's findings of fact if they are supported by substantial evidence in the record." Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).

V.   DISCUSSION

<u>Whether the ALJ Failed to Afford Appropriate Weight to the Reports of Plaintiff's Treating Psychiatrist</u>

Under applicable regulations and controlling case law, "opinions of a claimant's treating physician are entitled to substantial and at times even controlling weight." Fargnoli v. Massanari, 247 F.3d at 43

11

(citing 20 C.F.R. § 404.1527(d)(2)).  Such deference is accorded to treating physicians, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time."  Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir. 1987) (quoting Podedworny v. Harris, 745 F.2d 210, 217 (3d Cir. 1984)); 20 C.F.R. § 404.1527(d).  Moreover, where the treating physician is a specialist his opinion is entitled to even greater deference.  See Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993); 20 C.F.R. § 404.1527(d)(5).  A treating source's opinion on the issue of the nature and severity of a claimant's impairment will be given controlling weight if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(d).

An ALJ may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided.  Plummer v. Apfel, 186 F.3d at 429.  In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may not reject a treating physician's opinion due to his or her own credibility judgments, speculation or lay opinion.  Morales v. Apfel, 225 F.3d 310, 317-318 (3d Cir. 2000) (quoting Plummer, 186 F.3d at 429).  Where an ALJ elects to disregard a treating physician's opinion, he must explicate on the record his reasons for doing so.  Brewster v. Heckler, 786 F.2d 581, 584 (3d Cir. 1986).  It cannot be "for no reason or for the wrong reason."  Morales, 225 F.3d at 317 (quotations omitted).

In this case, plaintiff contends that the ALJ failed to afford appropriate weight to the reports of plaintiff's attending psychiatrist, Dr. Rogers, which if credited would result in a finding of disability.  The ALJ's decision makes it clear that he specifically considered Dr. Rogers' treatment notes and recognized Dr. Rogers as a treating source, but gave little weight to his assessment.  ALJ Reddy rejected Dr. Rogers' assessment, finding that absent her alcohol abuse and when compliant with medication plaintiff is capable

of performing simple routine work at any exertional level.

The Social Security Act provides that "an individual shall not be considered disabled...if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the determination that the individual is disabled." 42 U.S.C. § 1382c(a)(3)(J). 20 C.F.R. § 404.1535 (b)(1) of the Social Security Regulations states that: "[T]he key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol." The regulation mandates that the Commissioner consider whether absent drug or alcohol use the plaintiff would still be disabled.

The ALJ acknowledged that Dr. Rogers when assessing plaintiff's RFC, concluded that plaintiff had poor or no ability in almost every area considered and opined that even if the affects of her alcoholism were not considered she would be disabled. However, the ALJ specifically stated that he gave little weight to Dr. Rogers' findings because "although Dr. Rogers excluded the effects of the claimant's alcohol abuse in her assessment, Dr. Rogers did not consider the effects of medication noncompliance which is a very significant part of this case." (R. 22).

Pursuant to 20 C.F.R. 416.930(a) "In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work..." The regulation further provides that "If you do not follow the prescribed treatment without a good reason, we will not find you disabled..." 20 C.F.R. 416.930(b). Courts have examined four factors in considering whether a failure to comply with treatment will preclude disability benefits: (1) the treatment at issue must be expected to restore plaintiff's ability to work, (2) the treatment must be prescribed by a physician, (3) the claimant must have refused the treatment, and (4) the refusal must be without a justifiable excuse. Sharp v. Bowev, 705 F. Supp. 1111, 1123 (W.D. Pa. 1989) (citing Tester v. Heckler, 775 F.2d 1104, 1107 (10th Cir. 1985); Jones v. Heckler, 702 F.2d 950, 953 (11th Cir. 1983); Cassiday v. Schweiker, 663 F.2d 745, 749 (7th Cir. 1981)).

The ALJ considered the issue of plaintiff's alcohol abuse in combination with her failure to comply with treatment when assessing plaintiff's RFC. He concluded that when compliant with medication and not abusing alcohol plaintiff was able to perform simple routine tasks and no further limitations were supported by the record. However, there are no medical reports which truly speak to these issues. Rather, the ALJ improperly drew his own inferences from the record as to what effect plaintiff's sobriety and medication compliance would have and rejected Dr. Rogers' conclusions.

Although he gave little weight to Dr. Rogers' assessment, ALJ Reddy indicated that he gave "great weight" to the assessment of the state agency consultant, "as he provided specific reasons for his opinions showing support in the record." (R. 22). However, as plaintiff notes, the non-examining state agency opinion predated Dr. Rogers' assessment and the record review was done prior to plaintiff's counsel supplementing the record. State agency physician, Dr. Fink, obviously could not have considered plaintiff's hospitalization at Temple University Hospital Behavioral Health Services Crisis Response Center from August 12 to August 15, 2003, which lead to her referral to COMHAR. At that time, plaintiff's GAF score was assessed as 30 and she reported that she was depressed and could not stay in her house because they keep people locked in the basement next door. (R. 235, 223-264). Plaintiff reported that she would kill her neighbor if her daughter was not in the army and the examiner noted that plaintiff obviously posed a threat to her neighbor. (R. 230). The state agency consultant did not have the opportunity to review records of this hospitalization, any of Dr. Rogers' records, Dr. Rogers' assessment, or plaintiff's treatment notes from COMHAR, making his opinion very incomplete.

In rejecting Dr. Rogers' RFC assessment, ALJ Reddy also relied upon the improvement in plaintiff's GAF scores when she was discharged after several of her hospitalizations. The ALJ noted that plaintiff has been hospitalized many times with a dual diagnosis of depression and alcohol abuse and that at the time of all of her admissions she had been abusing alcohol and was non-compliant with taking her

psychotropic medications. (R. 21). He recognized that at the time of plaintiff's admissions, when plaintiff is abusing alcohol and failing to take medication, her GAF scores are "very low". He noted however that at the time of discharge, after abstaining from alcohol and taking her prescribed medications, plaintiff's GAF scores are much improved, indicating that they were "almost consistently assessed at 55-60". (R. 21).    The record indicates that in reality plaintiff's GAF scores upon discharge ranged from 40 to 60, but as the ALJ indicated, her scores showed dramatic improvement during her multiple hospitalizations. For example, although plaintiff was admitted to Friend's Hospital on December 1, 2000 with a GAF score of 30, at discharge on December 5, 2000, her GAF was 50 (R. 271-272). On July 2, 2001, plaintiff was admitted to Friends with a GAF of 15 and on July 10, 2001 was discharged with a GAF score of 55. (R. 269-270). Similarly, on November 22, 2001 her GAF was assessed at 15, but was 55 at the time of discharge on November 27, 2001. (R. 267-268). On April 14, 2002, she was admitted to Friends with a score of 30 and was discharged on April 19, 2002 with a score of 40. (R. 265-266). Finally, plaintiff was admitted to Temple on April 26, 2003 with a GAF score of 30 and was discharged on her alleged onset date, May 1, 2003, with a score of 60. (R. 158).

However, while it is true that plaintiff's condition, according to her assessed scores, drastically improved while hospitalized, as plaintiff argues, even the improved GAF scores are not indicative of improvement to the level found by the ALJ and are not sufficient to support the ALJ's inferences[2]. As noted by the ALJ and by Dr. Rogers', plaintiff has not taken her medications regularly enough to know

---

[2] A GAF score in the range of 31-40 indicates "some impairment in reality testing or communication (e.g. speech is at times illogical, obscure or irrelevant) OR major impairment in several areas such as work, school, family relations, judgment, thinking or mood; " a GAF score in the range of 41-50 indicates "serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job); a GAF score in the range of 51-60 indicates "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR some difficulty in social, occupational or school functioning (e.g. occasional truancy or theft within the household) but generally functioning pretty well, has some meaningful interpersonal relationships." Diagnostic and Statistical Manual of Mental Disorders (DSM- IV) 32, 34 (4th Ed. 2000).

whether they help. (R. 21, 212). While she testified that "presumably" they help with her manic symptoms and depression and they take a couple weeks to kick in, there are no medical reports or opinions in the record to indicate that if she was compliant they would restore her ability to work, as required for a denial of benefits on this basis. The record does not contain any opinions as to plaintiff's RFC if she took her medication as prescribed and no support for the ALJ's finding that her only limitation would be to simple routine tasks. While the ALJ recognized that plaintiff had "very low" GAF scores, he also failed to discuss the fact that plaintiff has had made suicide attempts in the past, that her symptoms included isolating, withdrawing from family and friends and that during treatment from May of 2000 to May of 2002, her GAF score was consistently assessed as 40 or one occasion 42, with repeated notations that she had made no progress. (R. 388, 378, 379, 410, 381-384).

The ALJ rejected Dr. Rogers' findings, indicating that "the extreme assessment of the claimant's current treating psychiatrist is based on a period of treatment when the claimant was not compliant with her psychotropic medications". (R. 24). The ALJ noted that although Dr. Rogers opined that plaintiff would still be disabled even if she was not using drugs and alcohol, Dr. Rogers never treated plaintiff during a period of consistent sobriety, and all of plaintiff's psychiatric hospitalizations have been related to alcohol abuse. (R. 22). The ALJ does not however reference any records which indicate that plaintiff was sober or that if she complied with treatment she would only be limited to simple work. A review of plaintiff's medical record, even prior to her alleged onset date, seems to indicate that plaintiff has never truly been compliant with treatment or stopped abusing alcohol. There are therefore no records to support the ALJ's findings regarding her ability to function absent alcohol abuse and with medication compliance.

As noted by the ALJ, the record as a whole, including Dr. Rogers' treatment notes repeatedly documents plaintiff's failure to take prescribed medication. The ALJ specifically referenced Dr. Rogers' notes indicating that in September 2003, plaintiff reported that she did not take her medication on a regular

16

basis and in December 2003, she stated she had not taken any medication since October. (R. 22). Furthermore, plaintiff failed to attend therapy as prescribed by her treating doctors. In September 2002, she reported that she wanted a new therapist because her old one had arranged for her to attend Northeast and she did not want to sit around 8 hours a day listening to people whine. She reported that after going a few times she was discharged from the program for non-compliance. (R. 133). Even after beginning to see Dr. Rogers', the record demonstrates that plaintiff's non-compliance continued. She began seeing Dr. Rogers on September 5, 2003 and notes from each of plaintiff's three other visits with Dr. Rogers reference her failure to comply with treatment. At plaintiff's second visit, on September 26, 2003, she admitted that she had not taken medication for a couple of weeks and still had not filled her prescription. (R. 211). On December 12, 2003, Dr. Rogers' notes reflect that plaintiff had not been coming to the program, that she admitted that she had not taken her medication regularly enough to know if they help and plaintiff planned to take her treatment more seriously. (R. 212). Finally, at her last visit with Dr. Rogers on January 20, 2004, although plaintiff admitted that when she does not take the medication, she gets depressed and drinks, the record reflects that she was not attending the program regularly and had been warned that she would be transferred out of the program. (R. 213).

According to plaintiff's own testimony, as of the time of the hearing she was still not complying with treatment or taking her medications as prescribed. Plaintiff testified that although she was originally supposed to go to COMHAR every day, she "hardly even went twice a week." (R. 44-45). Although plaintiff testified at the hearing that she intended to take her medication in the future, she admitted that she was still not currently taking her medication the way she was supposed to. (R. 46-47). Furthermore, plaintiff does not even argue that she has a reasonable explanation for her failure to comply. Pursuant to Social Security Ruling 82-59, in cases where the ALJ has determined that an individual's impairments preclude her from engaging in substantial gainful activity, i.e., an individual who would otherwise be

found to be disabled under the Act, the hearing examiner is obligated to provide the claimant "an opportunity to fully express the specific reason(s) for not following the prescribed treatment." SSR 82-59; See also Lozada v. Barnhart, 331 F. Supp.2d 325, 339 (E.D. Pa. 2004). Pursuant to the regulations, there are certain acceptable reasons for failure to follow prescribed treatment. 20 C.F.R. 416.930(c). However, here, plaintiff's only explanation has been her statements that attending therapy "can be so monotonous" and that her medication caused weight gain. (R. 45).

     The ALJ's finding of non-compliance is undeniably supported by the record and the ALJ clearly had no basis pursuant to 20 C.F.R. § 416.930(c) to find plaintiff's reasons for her noncompliance to be acceptable. However, while, we agree with the ALJ that the record is riddled with references to plaintiff's failure to comply with treatment and her continued abuse of alcohol, without further support from the record we cannot find the ALJ's conclusion regarding disability to be supported by substantial evidence. There are no medical reports which indicate that plaintiff's compliance would restore her ability to work as inferred by the ALJ. The record does not include medical evidence to support the ALJ's findings as to plaintiff's RFC. We therefore agree that the ALJ should have sought an opinion from a medical expert or at least should have recontacted Dr. Rogers. The ALJ noted that Dr. Rogers failed to even comment on plaintiff's noncompliance, which the ALJ found to be a significant part of this case, but rather than seeking an opinion on the issue from Dr. Rogers or supplementing the record with expert testimony, ALJ Reddy simply rejected her conclusions in favor of his own inferences.

     Given her continued abuse of alcohol without any attempt at rehabilitation and her repeated noncompliance with prescribed treatment, including both therapy and medication, we do not find this plaintiff to be at all sympathetic. We acknowledge that the ALJ is not bound to accept Dr. Rogers' conclusions regarding the ultimate issue of disability and do not find the record adequate to support a reversal. However, we have no choice but to recommend remand to allow the ALJ to fully develop the

record and to properly consider medical opinions regarding the effect of plaintiff's drug or alcohol abuse pursuant to 20 C.F.R. § 404.1535 (b)(1) and then if she would still be disabled absent her alcohol abuse to consider pursuant to 20 C.F.R. 416.930(a) whether compliance with medication would enable plaintiff to engage in gainful employment . Given these two issues to be examined, and in order to prevent another situation where an opinion is based upon an incomplete record, we agree with plaintiff that it may be advisable to have a medical expert present at the hearing.

Therefore, I make the following:

## RECOMMENDATION

AND NOW, this           day of *July*, 2005, IT IS RESPECTFULLY RECOMMENDED that Defendant's Motion for Summary Judgment be DENIED, that Plaintiff's Motion for Summary Judgment be GRANTED, and that the case be REMANDED to the Commissioner of the Social Security Administration, pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings consistent with this Report and Recommendation.

BY THE COURT:

CHARLES B. SMITH
UNITED STATES MAGISTRATE JUDGE